In the Matter of **LUSCOMBE ENGI-NEERING COMPANY, Inc.,**
**Bankrupt.**
No. 24522.

United States District Court
E. D. Pennsylvania.
June 30, 1958.

707

Wexler, Mulder & Weisman, Miller, Adelman & Lavine, David H. H. Felix, Philadelphia, Pa., for trustee.

Harold K. Wood, U. S. Atty., Joseph J. Zapitz, Asst. U. S. Atty., Philadelphia, Pa., for U. S.

Bertram K. Wolfe, Philadelphia, Pa., referee in bankruptcy.

Anthony G. Felix, Jr., Philadelphia, Pa., for First Pa. Banking & Trust Co.

Murdoch K. Goodwin, Philadelphia, Pa., for Federal Reserve Bank of Philadelphia, Fiscal Agent for Dept. of Army.

GRIM, District Judge.

These are two petitions to review the order of a referee in bankruptcy on the petition of the United States and The First Pennsylvania Banking and Trust Company for an order on the trustee in bankruptcy to pay over certain moneys he received from Chrysler Corporation and Philco Corporation. The facts are undisputed.

Chrysler and Philco made separate and distinct contracts with the government to manufacture different types of military equipment. From time to time each of them entered into separate subcontracts with Luscombe Engineering Company, Inc. for the manufacture of components of this equipment.

In order to obtain money Luscombe entered into a Loan Agreement in 1951 with The First National Bank of Philadelphia, predecessor of The First Pennsylvania Banking and Trust Company. Under this agreement Luscombe borrowed money from the bank on notes secured by successive assignments of its right to all moneys due and to become due to Luscombe from Chrysler and from Philco on present and future subcontracts with them. The government guaranteed payment of 90% of the loans.

There was no attempt to secure these loans by liens on machinery, tools, equipment, raw materials, or goods partially or completely manufactured, by chattel mortgage, bailment lease, or any other security device.

Luscombe was adjudicated a bankrupt December 9, 1955, and ceased deliveries to Chrysler and Philco. At this time the bank held Luscombe's notes dated from August 22, 1955, to November 15, 1955, on which there was owing a total of $321,911.81, and assignments by Luscombe dated between September 26, 1952, and February 7, 1955, of moneys payable under Chrysler and Philco contracts. The government paid the bank the

amounts it guaranteed and as to those amounts stands as a creditor in the shoes of the bank.

At the time of bankruptcy, in addition to some partially and fully completed goods for Philco, Luscombe had on hand special dies and tools which it had made to do the work for Philco and Chrysler. The contracts required Luscombe, upon completion of the contracts, to deliver these tools and dies to Philco and Chrysler, who were to pay for them. Chrysler, Philco, and the government exerted extreme pressure on Luscombe's receiver to obtain quickly these tools and dies and the finished and unfinished goods.

The present controversy concerns the disposition of three funds paid to the receiver and trustee [1] by Philco and Chrysler on delivery to them of these tools and dies and finished and unfinished goods within 60 days after the adjudication of bankruptcy. The government and the bank claim the funds on the theory that the receiver and trustee assumed the bankrupt's contracts and that because of the assumptions the funds were payments under the contracts and pass to the bank under the assignments. The trustee contends that the contracts were not assumed, that these post-bankruptcy transactions were mere sales, and that he is entitled to the funds as part of the bankrupt estate. The referee found two issues in favor of the bank and the government and the other in favor of the trustee. Each party has petitioned for review and claims all three funds.

### Chrysler

■ The first of the three transactions involved tools and dies, which Chrysler was very anxious to obtain instantly. Its army tank assembly line was at a standstill and would remain stopped until Chrysler could obtain parts made by tools and dies such as the receiver had. To make duplicates would lengthen the delay. The ideal solution, since the bankrupt was not producing, was for Chrysler to get the tools and dies from the receiver and to put them to use. The tools and dies were of substantial value only for the production of these tank parts. Negotiations against this background produced an offer by Chrysler to the receiver on December 16, 1955, seven days after the adjudication of bankruptcy:

> "If said tools and dies are released to our company immediately, our company shall pay to you in accordance with our contract with the bankrupt the sum of $4,490.98 within 30 days of such delivery. This obligation to make this payment is absolute and we will not, under any circumstances, set-off or withhold payment on account of any claims which we may have against the bankrupt by reason of breach of contract or otherwise.

> "We realize that you are obtaining a court order to release these dies upon the basis of our commitment as above."

On the same day, December 16, 1955, there was presented to the referee a petition entitled "Petition of Receiver for Leave to Release Property to Chrysler Corporation." It set forth that the receiver had been appointed and had qualified, that Luscombe had been engaged as a subcontractor of Chrysler in the production of tank parts ordered by the government, that the subcontractor was in default under its contract for failure to make deliveries of the parts, that as a result Chrysler was unable to continue the production of tanks, that Chrysler could not obtain the parts elsewhere because the dies and tools required to make them were in the bankrupt's possession, that

> "6. Under the terms of its contract with Chrysler Corporation the bankrupt was called upon to make the highly specialized tools and dies required to produce the parts in question and the cost thereof was to be paid by Chrysler Corporation in installments amortized over the

---

1. The receiver was appointed trustee January 19, 1956.

period of the contract most of which have already been paid."

that Chrysler claimed ownership of the tools and dies under the terms of the contract and might be entitled to substantial damages for breach of the contract, that the tools and dies had no value to the estate other than a very nominal value as scrap, "whereas under the contract between the parties, the balance of the cost thereof, as yet unpaid is the sum of $4,490.98," that the receiver had obtained from Chrysler "a written commitment to honor its obligations in the above amount within 30 days from delivery of the tools without regard to any set-off or counterclaim * * *," that the situation was urgent, that Chrysler's failure to receive the dies would seriously hamper military production, and that

"10. * * * by reason of the scrap value of the dies except for the purposes of the above contract, the release of the same to Chrysler Corporation for the above sum represents the most profitable arrangement which can be made under the circumstances for the disposition of said property and is in the best interest of creditors."

The petition prayed "that an order be entered granting leave to deliver such dies and tools to Chrysler Corporation under the arrangement hereinabove set forth." The petition did not request permission to assume the contract, nor can any intention to assume be found from the petition as a whole.

On the same day, December 16, 1955, the referee signed the annexed order "that the Receiver is authorized and directed to deliver to Chrysler Corporation the tools and dies described in the exhibit attached to the said petition upon the terms and conditions set forth in said petition and upon receipt of said fund the same shall be segregated," until further order. The order did not specifically grant the receiver permission to assume the contract or any obligation under it. There is nothing in the order to indicate that the problem of assumption was considered by the referee at that time.

The receiver delivered the tools and dies and received the $4,490.98.

On the subsequent petition of the government and the bank to pay over this fund to them, the referee directed it to be paid over, finding that the receiver had assumed Luscombe's contract with Chrysler.

Section 70, sub. b of the Bankruptcy Act, 11 U.S.C.A. Sec. 110, sub. b, provides:

"Within sixty days after the adjudication, the trustee shall assume or reject any executory contract * * * Any such contract * * * not assumed or rejected within such time, whether or not a trustee has been appointed or has qualified, shall be deemed to be rejected * * *'"

There are in this transaction certain facts which would indicate that the receiver assumed the Chrysler contract. The dies and tools were delivered to the party who was to receive them under the contract. The amount paid was the same as the contract provided. The offer was to pay "in accordance with our contract." The receiver did not in terms ask for "a sale" and the referee did not in terms order "a sale."

There are other factors, however, which persuade me that this transaction was not an assumption of the contract, but a sale. Of crucial importance is the fact that the Chrysler contract was entirely a contract to manufacture. What Chrysler wanted when it made the contract was tank parts, which Luscombe could manufacture. The dies and tools were a subsidiary matter. Nowhere and at no time did the receiver ask permission to manufacture, and nowhere did the referee grant such permission. In fact, by getting rid of these dies and tools, the receiver disabled himself from manufacturing tank parts. The dies and tools were sold to Chrysler because Chrysler was the only customer likely to pay a substantial price for them. The coincidence between the contract price

and the sale price was predictable from the fact that Chrysler and Luscombe had previously agreed at arm's length on the amount, and it therefore constituted a measure of fair value to which both the receiver and Chrysler could reasonably agree and which sum the bankrupt estate, fortunately for it, could obtain because of the urgent need for the dies and tools. Although there was appended to Chrysler's offer a postscript undertaking to pay without set-off for prior contract deliveries not previously paid for, the situation of the parties, the offer, the petition, and the order indicate a sale rather than an assumption of the contract.[2]

In his opinion on the government's and bank's petition to pay over, the referee said:

> "The words used in the offer, the petition and the order all refer to performance under the existing contract. It may be that the receiver, acting under the pressure above described, used words without realizing their purport, but the referee cannot and should not find as a fact an intention contrary to the parties expressed words. Accordingly, I will find as a fact that the receiver adopted the Chrysler contract * * *"

I am unable to agree with this conclusion of the referee. The words used in the offer, petition, and order do refer to the contract, but I do not construe them as referring to assumption or performance of it. The references are in the main to price and payment under the contract. Payment, moreover, was to be at a time earlier than that called for by the contract. In addition the words called for delivery of the tools and dies immediately, and not at the end of the period specified in the contract. These details do not constitute performance of the contract, but a radical departure from its terms.

In order for a receiver to become bound by a contract, he must positively indicate his intention to assume it. Pacific Western Oil Co. v. McDuffie, 9 Cir., 1934, 69 F.2d 208, 213, certiorari denied 293 U.S. 568, 55 S.Ct. 79, 79 L.Ed. 667; In re Public Ledger, D.C.E.D.Pa.1945, 63 F.Supp. 1008, 1014. The receiver has not in any way indicated such an intention.

The order of the referee with respect to the Chrysler transaction will be reversed.

### Philco (No. 1)

The second transaction involved cases and panels which Luscombe had completed under the Philco contract but had not delivered before bankruptcy. Philco was in urgent need of these goods for its government contract and offered to pay immediate cash for them.

On December 27, 1955, within 60 days of the adjudication, there was presented to the referee a petition entitled "Petition of Receiver for Leave to Sell Property to Philco Corporation." It set forth that the bankrupt had been engaged as a subcontractor of Philco in the production of portable microwave equipment ordered by the government, that the bankrupt was in default under its contract for failure to make deliveries of the equipment, that as a result Philco was hampered in its production, that Philco could not obtain the equipment elsewhere without substantial delay because special tooling and operating facilities were required to make it, that at the time of filing the bankruptcy petition the bankrupt had on hand completed equipment, presently in the receiver's possession, consisting of nine cases and 40 panels, that "such equipment being of a highly individual and special design has no value whatsoever to the estate other than as scrap," that

> "8. Philco has offered to purchase from your petitioner all of

---

2. The fact that a petition was presented to the referee does not necessarily mean that the receiver intended to make a sale. While permission to make a private sale is required, General Order in Bankruptcy No. 11, 11 U.S.C.A. following Section 53, it seems that permission to assume the contract would also have been required, 4 Collier on Bankruptcy 1232, 1233, Sec. 70.43.

the above described finished equipment at a price of $158.00 per unit for the cases and $7.15 per unit for the panels * * * or $1,708.00 in all, and has tendered its check to your petitioner in said amount upon condition that delivery be made by December 27, 1955."

that delivery of the equipment was urgent and Philco's failure to receive it forthwith would very seriously hamper military production, and that

"10. The amounts which Philco Corporation has offered for said equipment represent the prices set forth in the contracts with the bankrupt and are much more than could be obtained for said property in any other disposition of same."

"11. Your petitioner is satisfied that by reason of the scrap value of said equipment except for the purposes of said contract, the sale of same to Philco Corporation for the above sum represents the most profitable disposition which can be made under the circumstances and is in the best interest of creditors."

The petition prayed "that an order be entered granting leave to sell such equipment to Philco Corporation for $1,708.00 under the terms set forth hereinabove."

On the same day, December 27, 1955, the referee signed the annexed order, "it appearing that cause is shown to justify a sale without notice," that the receiver "is hereby authorized and directed to sell at private sale to Philco Corporation for the total price of $1,708.00, 9 inner and outer cases for portable microwave equipment, made by the bankrupt pursuant to contract with said company, * * * and 40 panels for such cases * * *, delivery to be made upon receipt of check of Philco Corporation in said sum, and it is further ordered that said funds be segregated until the further order of this court."

The receiver delivered the goods and received the $1,708.

On the subsequent petition to pay over, the referee found that the receiver had assumed this contract also and awarded this sum to the government and the bank.

I find nothing to distinguish this transaction in principle from the Chrysler sale. There is the coincidence of the buyer with the party to the contract, and the sale price with the contract figure, but again there is no indication that the receiver intended to assume the contract to manufacture or that Philco's offer contemplated such assumption. This was a simple sale, as it was labeled in the petition and the order.

The order of the referee with respect to the first Philco transaction will be reversed.

### Philco (No. 2)

█ The third transaction involved two categories of chattels connected with the Philco contract: (a) inventory, work in progress, and unfinished assemblies, and (b) tooling which Philco claimed as owner.[3] Philco had a similarly urgent need for all these goods. It offered on January 18, 1956, "to purchase from the bankrupt estate of Luscombe Engineering Company" the goods in category (a) for $33,477.84. The offer was "conditioned on the return to Philco Corporation of the tooling * * * [category (b)] which Philco Corporation specifically ordered from Luscombe Engineering Company and paid for, and therefore owns * * *".

On January 20, 1956, within 60 days of the adjudication, there was presented to the referee a petition entitled "Petition of Trustee for Leave to Sell Property to Philco Corporation," containing averments similar to those in the receiver's petition of December 27, 1955, referring to certain categories of inventories, work in progress, unfinished assemblies, tooling, dies, etc., and setting forth that

"8. Philco Corporation has offered to purchase from your petitioner all of the above described property

3. Other tooling, dies, etc., mentioned in the offer, the trustee's petition for sale, and the order, and valued at $5,000, are not involved in these petitions for review.

* * * for the total price of $33,-477.84, and has agreed to pay for same upon delivery provided the property described in * * * [category (b)] is delivered without charge to Philco Corporation * * *,"

"10. The price which Philco Corporation has offered for said property bears a reasonable relationship to the value thereof as determined by the cost records of the bankrupt and also bears a reasonable relationship to the percentage of completion and to the prices payable under the said contract, and is much more than could be obtained for said property in any other disposition of the same,

"11. * * * by reason of the scrap value of said property except for the purposes of said contract, the sale of same to Philco Corporation for the above sum represents the most profitable disposition which can be made under the circumstances and is in the best interest of creditors,

"12. By reason of the urgency of the sale herein proposed under the circumstances hereabove set forth, your petitioner requests that a hearing be held to consider this petition upon such short notice to the creditors committee appointed herein as may be practical."

The petition prayed "that an order be entered, after hearing as set forth hereinabove, granting leave to sell to Philco Corporation the property described in its offer to purchase for the sum of $33,-477.84 upon the terms and conditions of said offer."

After hearing, the referee signed on January 25, 1956, the annexed order "that the trustee in bankruptcy is authorized and directed to accept the offer of Philco Corporation attached to the within petition and pursuant thereto to sell at private sale to Philco Corporation for the total price of $33,477.84 the property described * * * upon the terms and conditions of said offer, delivery to be made upon receipt of check * * *," and ordering the fund to be segregated.

The trustee delivered the goods covered by the $33,477.84 offer, as well as the goods in category (b), and received the money.

On the subsequent petition to pay over, the referee found this transaction to have been simply a sale and not an assumption of the existing contract.

While a finding that the first Philco transaction was a sale would not necessarily preclude the second from being an assumption of the contract, I can find nothing in the facts or the law to distinguish the two. There was no future manufacturing contemplated in the second transaction, and in fact, by disposing of the tooling, it was clearly contemplated by both the trustee and Philco, as in the Chrysler transaction, that the trustee would do no manufacturing: i. e. that the trustee would not perform the contract. The order of the referee with reference to the second Philco transaction will be affirmed.

■ The government and the bank have sought to place on all these transactions a strained construction in order, in effect, to convert their security interest in the contract proceeds into what would amount to a lien on tangible goods. In this the law and the facts do not support their efforts. The contracts were entered into in Pennsylvania and Pennsylvania law controls. The enactment of the Uniform Commercial Code in Pennsylvania, effective July 1, 1954, 12A P.S. § 1–101 et seq., provided a convenient method of establishing a lien on the goods more than a year before the bankruptcy. The bank could have taken advantage of its terms, but did not. The courts cannot now do this for these claimants.

The order of the referee as to the Chrysler transaction and the first Philco transaction is reversed; as to the second Philco transaction it is affirmed.